**TARTER KRINSKY & DROGIN LLP**
*Counsel to Deborah J. Piazza, Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
Rocco A. Cavaliere, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

In re                                                           Chapter 7

ORLY GENGER,                                          Case No. 19-13895 (JLG)

                               Debtor.
----------------------------------------------------------X
DEBORAH J. PIAZZA, as Successor CHAPTER 7
TRUSTEE, of the Bankruptcy Estate of Orly
Genger,

                                    Plaintiff,
                                                              Adv. Pro. No. 21−01180 (JLG)

             -against-


MICHAEL OLDNER, THE ORLY GENGER 1993
TRUST, RECOVERY EFFORT INC., SAGI
GENGER, THE SAGI GENGER 1993 TRUST,
DALIA GENGER, ELANA GENGER, DAVID
PARNES, D&K GP LLC, TPR INVESTMENT
ASSOCIATES, INC., MANHATTAN SAFETY
MAINE, INC. AND JOHN AND JANE DOES 1-
100,

                                  Defendants.
----------------------------------------------------------X

## PLAINTIFF'S OPPOSITION TO MOTION OF SAGI GENGER 1993 TRUST TO DISMISS FOR IMPROPER SERVICE OF PROCESS

TO THE HONORABLE JAMES L. GARRITY JR.,
UNITED STATES BANKRUPTCY JUDGE:

        Plaintiff Deborah J. Piazza, as Successor Chapter 7 Trustee (the "Plaintiff" or "Trustee") of

the Bankruptcy Estate of Orly Genger (the "Debtor"), submits this opposition (the "Objection") to

the motion to dismiss for improper service of process filed by The Sagi Genger 1993 Trust ("Sagi

Trust" or "Defendant") pursuant to Rule 12(b)(2), (4) and (5) of the Federal Rules of Civil

Procedure made applicable by Federal Rule of Bankruptcy Procedure 7012(b) (the "Motion" or

"Motion to Dismiss") [Adv. Pro. Dkt. No. 15], and states as follows:

## PRELIMINARY STATEMENT

As noted in the Trustee's objection dated November 26, 2021 to the separate motion to

dismiss filed by all of the various named Defendants (except for Sagi Trust), this is an action to

avoid post-petition releases (the "Releases"), including one in favor of Sagi and among others, his

trusts (the "Sagi Trust Release") that were intentionally executed and received in the shadows and

without court approval in blatant and willful violation of the automatic stay despite the Defendants'

knowledge that the Debtor's chapter 7 case was pending and that the automatic stay was in effect.

Unlike the other Defendants, the Sagi Trust filed the Motion to Dismiss on procedural grounds

arguing that the Plaintiff's service of the Complaint on the Sagi Trust was improper. As reflected

more fully herein, the Trustee's service of the Complaint on the Sagi Trust was proper and satisfied

due process. As such, the Motion to Dismiss should be denied and the Sagi Trust should be

required to answer the Complaint.

## BACKGROUND

1.      On May 28, 2021, the Trustee filed a motion to approve a settlement (the

"Settlement Motion") with various third parties, which relief includes the Trustee's potential sale

of certain causes of action to Claims Pursuit Inc. ("Claims Pursuit"). The Trustee filed various

declarations in support of the Settlement Motion as well as a Reply to Various Objections (the

"Settlement Motion Reply"). The Settlement Agreement annexed to the Settlement Motion

indicated that the Trustee would commence this adversary proceeding to avoid the Releases,

including the Sagi Trust Release. See Settlement Agreement, ¶ 15. At no point in time, from the

time the Releases were discovered in June 2020 through the commencement of the adversary

proceeding did the Defendants (including the Sagi Trust) take any action to revoke or rescind the Releases.

2.        On July 16, 2021, the Sagi Trust, by its counsel, Emmet Marvin & Martin LLP ("Emmet Marvin") formally appeared in the bankruptcy case and filed an objection to the Settlement Motion on behalf of the Sagi Trust (the "Sagi Trust Objection").[1] See Main Case Dkt No. 493.   The current trustee of the Sagi Trust is purported to be the Cook Islands Trust Corporation Limited.   However, upon information and belief, there is no one specific individual employed by the Cook Islands Trust Corporation Limited that has been assigned the role of or appointed as trustee of the Sagi Trust.

3.        The Court held an evidentiary hearing on the Settlement Motion on August 10, 2021 and heard oral argument on August 24, 2021.  Emmet Marvin, by John Dellaportas, Esq. and Thomas E. Pitta, Esq. appeared at each of the hearings on behalf of the Sagi Trust, among other parties.

4.        On August 14, 2021, the Trustee commenced this adversary proceeding by filing a complaint (the "Complaint") to avoid improper post-petition Releases in violation of the automatic stay that were executed by Oldner, the purported trustee of the Orly Genger Trust in favor of numerous Defendants, including Sagi and his trusts in which he was a beneficiary, *i.e.* the Sagi Trust.

5.        After John Dellaportas, Esq. of Emmet Marvin advised that he did not have authority to accept service on behalf of the Sagi Trust, Plaintiff served the Complaint on the Sagi Trust by Federal Express and Express Mail as well as on its agents Sagi Genger and Emmet

---

[1] As the Court is well aware, Emmet Marvin has been very active in this case, taking numerous positions on behalf of Sagi Genger and TPR Investments Associates, Inc.

Marvin. <u>See</u> Declarations of Service dated September 2, 2021 and September 15, 2021. <u>See</u> Adv. Pro. Dkt. Nos. 3 and 5.

6.      On September 27, 2021, the Sagi Trust filed the Motion to Dismiss for improper service.  On October 7, 2021, the Sagi Trust filed a Notice of Hearing setting the hearing for December 9, 2021 and requiring objections by the deadline set forth in accordance with the Bankruptcy Rules and the Local Rules, <u>i.e.</u> within 7 days of the hearing date.

7.      On October 7, 2021, Thomas E. Pitta, Esq. and Judith Swartz, Esq. of Emmet Martin each filed a notice appearance in this adversary proceeding formally appearing for the Sagi Trust, as well as Sagi Genger, Elana Genger, David Parnes, D&K GP LLC and TPR Investment Associates Inc.

8.      On October 22, 2021, the other named Defendants (excluding the Sagi Trust) filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "<u>Defendants' 12(b)(6) Motion</u>").

9.      On November 26, 2021, the Trustee filed an Opposition to the 12(b)(6) Motion (the "<u>Trustee's 12(b)(6) Objection</u>") with a reply due no later than December 2, 2021, as discussed at the conference on October 20, 2021.

10.      The Trustee respectfully refers this Court to the Complaint and the Trustee's 12(b)(6) Objection for a full recitation of the relevant background and history that led to the commencement of this adversary proceeding.  Further, to the extent any capitalized terms set forth herein are not defined in this Objection, they shall have the meanings ascribed to such terms in the Trustee's 12(b)(6) Objection.

## <u>OBJECTION TO MOTION TO DISMISS</u>

11.      As will be demonstrated herein, the Motion to Dismiss must be denied because the Trustee has satisfied the requirements for service of the Summons and Complaint on the Sagi Trust

by virtue of the receipt of the Summons and Complaint by the Sagi Trust and its agents or others

that may be in control of the Sagi Trust.  To the extent that the Court finds that the Summons and

Complaint were not properly served, under the circumstances, this Court should grant the Trustee

permission to conduct jurisdictional discovery or serve the Summons and Complaint on counsel

to Sagi Trust or Sagi Genger in his capacity as (i) the beneficiary of the Sagi Trust and  (ii) assignee

of the Sagi Trust's claims against various parties, including Orly Genger and the Orly Genger

Trust.

    **A.**   **The Summons and Complaint Were Properly Served On The Sagi Trust.**

    12.     There are a number of reasons that support a finding that the Summons and

Complaint were properly served.

    13.     First, as noted herein and as reflected in the docket of the Debtor's bankruptcy case,

the Sagi Trust appeared in the Debtor's bankruptcy case just a few months ago and filed the Sagi

Trust Objection to the Trustee's Settlement Motion.  Numerous courts in this District have found

that parties that interject themselves in a Debtor's bankruptcy case through retained counsel will

submit themselves to the jurisdiction of the Court and expressly or impliedly authorize counsel to

accept service in other contested matters and adversary proceedings related to the bankruptcy case.

*See In the Matter of Paddington Press, Ltd*., 5 B.R. 343, 346 (Bankr. S.D.N.Y. 1980) (finding that

counsel to banking institution and receiver that filed objection to debtor's proposed financing in

the debtor's case was an agent authorized to receive service of process in the adversary proceeding

in the chapter 11 case); *In re Reisman*, 139 B.R. 797, 801 (Bankr. S.D.N.Y. 1992) ("when a

defendant takes an active role in a chapter 11 case and appears through counsel in a proceeding

integrally related to the case, such counsel is implicitly authorized to receive process for the

defendants", including a motion to convert the case and a Rule 2004 application); *Luedke v. Delta

Air Lines, Inc*., 159 B.R. 385 (S.D.N.Y. 1993) (a foreign corporation/creditor with no place of

business in United States impliedly authorized its attorney to accept service because its attorney attended committee meetings, commented on a reorganization plan and a complaint filed by the debtor against another creditor); *In re Ms. Interpret*, 222 B.R. 409, 416 (Bankr. S.D.N.Y. 1998) (finding that law firm was expressly and implicitly authorized to receive service on behalf of defendant where law firm took active positions in the bankruptcy case, noting that Federal Rule 7004(b)(3) reflects that an agent that the corporation appoints, either expressly or implicitly, may accept service on its behalf); *see also In the matter of Ira Haupt & Co.*, 289 F.Supp. 966 (S.D.N.Y. 1968) (creditor that intervened in a bankruptcy case in opposition to a motion to dismiss and stated its interest as a creditor found to have submitted to jurisdiction of court for purposes of action against creditor); *see e.g. United States v. Bosurgi*, 343 F.Supp. 815 (S.D.N.Y. 1972) (an attorney may be implicitly authorized to accept process as an agent for the client when the attorney previously participated in a related litigation).

14.     Aside from the numerous cases in this District, other courts have routinely found that an attorney can be viewed as an agent with implied authority to accept service of an adversary complaint when that attorney has taken an active role in the bankruptcy case and elsewhere. *In re Focus Media, Inc.*, 387 F.3d 1077 (9th Cir. 2004); *see also In re Muralo Company, Inc.*, 295 B.R. 512 (Bankr. D.J. 2003) ("in the bankruptcy setting, an attorney who has provided a creditor active and vigorous representation in the main bankruptcy case may be found to have implied authority to receive service of process in a related adversary proceeding").   The Ninth Circuit in *In re Focus Media, Inc.*, 387 F.3d 1077 (9th Cir. 2004) found that service by a plaintiff was proper when sent to a lawyer that participated on behalf of a corporation and its principal on several occasions in the bankruptcy case as well as litigation outside of the bankruptcy case.   The *Focus Media* court stated "we hold today that in an adversary proceeding in bankruptcy court, a lawyer can be deemed to be the client's implied agent to receive service of process when the lawyer repeatedly represented that

6

client in the underlying bankruptcy case, and where the totality of the circumstances demonstrates the intent of the client to convey such authority." *Id*. at 1079.

15.    In addition to the foregoing, John Dellaportas, Esq., while at prior firms, has appeared on behalf of the Sagi Trust in at least the 2010 Action (defined below) in New York Supreme Court, as well as in the Surrogate Court.  Mr. Dellaportas has also served as counsel to Sagi in his capacity as assignee of the Sagi Trust's claims emanating from the Stipulation of Settlement dated October 29, 2004 that resolved Arie's and Dalia's divorce.  Thus, there is no question, for all of the foregoing reasons, Emmet Marvin and Mr. Dellaportas, while at prior firms, have advanced arguments on behalf of the Sagi Trust for many years in this Court and other courts in New York. *Id*. at 1084; *see also Bosurgi*, 343 F.Supp. at 815 (receipt of process by attorney in suit in federal court involving relative rights to settlement fund was necessarily an incident of attorneys' efforts to establish association's claim to fund by opposing claims of government as well as all other claimants, so that association's attorneys were impliedly authorized to receive service of process on behalf of association named as defendant in federal suit").

16.    Second, the filing and nature of the Sagi Trust Objection in the main bankruptcy case cannot be understated.  The Defendants in this action claim that the legal issues relating to the ability of the Trustee to sell what the Defendants describe as "derivative" claims as part of the Settlement Motion has an impact on the legal issues to be addressed in this adversary proceeding. Thus, if true, the Sagi Trust Objection to the Settlement Motion goes to the related issues pending in this adversary proceeding  as to whether the Releases were improper postpetition transfers that violated the automatic stay.  Thus, while the Sagi Trust Objection was filed in the main bankruptcy case and not this adversary proceeding, it is clear that the Sagi Trust has submitted to the jurisdiction of this Court to address the "related issues" pertaining to the Releases, including the Sagi Trust Release.  This is especially the case since the Sagi Trust was obviously aware of the

7

full contents of the Settlement Agreement when it filed the Sagi Trust Objection, which contents included paragraph 15 of the Settlement Agreement that expressly stated that the Trustee would void the Releases dated August 15, 2019 in favor of Sagi and others that were intended Releasees. Therefore, the Sagi Trust, in filing an objection to the Settlement Motion was clearly aware that an action would be brought and they submitted themselves to the jurisdiction of this Court notwithstanding the foregoing.

17.     Third, aside from appearing in the Debtor's case through the filing of the Sagi Trust Objection and appearance at two hearings in connection therewith, the Motion to Dismiss for improper service is also moot at this time since Emmet Marvin filed formal notices of appearance in this adversary proceeding on October 7, 2021, thereby explicitly authorizing Emmet Marvin to accept service of the Complaint. See Adv. Pro. Dkt. Nos. 17 and 19.  Thus, having since formally appeared in this adversary proceeding on behalf of the Sagi Trust, the Sagi Trust cannot complain that the Trustee's service of the Summons and Complaint on Emmet Marvin was improper.  In sum, the Motion to Dismiss should be denied for this simple reason alone.

18.     Fourth, Emmet Marvin was not the only party to be served with the Summons and Complaint as the Sagi Trust's agent.  The Summons and Complaint was also served by first class mail to the Sagi Trust for the attention of Sagi Genger at his home in Connecticut.  Sagi Genger is the beneficiary of the Sagi Trust.  However, that is not all.  By virtue of a written assignment dated December 30, 2012 filed on the Court docket of the 2010 Action, a copy of which is annexed hereto as **Exhibit "A"**, the Sagi Trust previously assigned to Sagi Genger various rights to pursue "claims, demands, and/to causes of action of any kind whatsoever that the SG Trust has against TRI, its present and past officers and directors, and their respective affiliates, concert acting or related parties (including but not limited to, Arie Genger, William Dowd, Orly Genger and the Orly Genger 1993 Trust), in connection with, arising out of, or resulting from the Stipulation of

8

Settlement."[2]    After obtaining this written assignment, Sagi Genger filed various counterclaims
and cross-claims in the 2010 Action in his individual capacity and as assignee of the Sagi Trust.[3]
Copies of the Court's orders denying various summary judgments filed by Sagi Genger on his own
behalf and as assignee of the Sagi Trust against, among others, the Trump Group, Arie, Orly and
the Orly Genger Trust are annexed hereto as **Exhibits "B" and "C"**.[4]    As a result of the foregoing,
it appears that Sagi Genger may actually be the real party in interest to pursue claims of the Sagi
Trust against various parties, including Orly and the Orly Trust.[5]    As set forth more fully below,
discovery may reveal that it was Sagi Genger, not the trustee of the Sagi Trust, that directed the
filing of the Sagi Trust Objection, further demonstrating that it was proper to serve Sagi Genger
on the Sagi Trust's behalf in this adversary proceeding.

19.    Fifth, even if Sagi Genger can talk himself out of the written assignment described
above which purports to give him authority to act on behalf of the Sagi Trust in connection with
any claims against Orly and the Orly Trust, he cannot escape the fact that, at a minimum, he is an
agent of the Sagi Trust by virtue of his own actions in connection with the subject matter at issue
in this adversary proceeding. The testimony taken in the Debtor's bankruptcy case reveals that
Sagi Genger appeared in Texas on or about August 15, 2019 with Releases in hand and gave them

[2] The Stipulation of Settlement was defined as that "certain divorce Stipulation of Settlement between Arie Genger and Dalia Genger, signed on or about October 30, 2004.
[3] *See Arie Genger, et al., v. Sagi Genger, et. al.,* Index No. 651089/2010 (the "2010 Action"), First Amended Answer, Counterclaims, Cross Claims, and Third Party Complaint of Sagi Genger, Individually and As Assignee of the Sagi Genger 1993 Trust and TPR Investment Associates, Inc. [See 2010 Action, Dkt. No. 432]
[4] In footnote 1 of the Motion, the Sagi Trust claims it is reserving its right to object to formally move, in the future, for dismissal for lack of personal jurisdiction. The Sagi Trust, like the Orly Trust, is governed by New York law and for most of its existence, the trustee of the Sagi Trust was not based in the Cook Islands. Further, the Sagi Trust has appeared in numerous New York courts over the years, including this Court when it filed the Sagi Trust Objection. While the Trustee cannot foresee any basis for an assertion that there is no personal jurisdiction here over the Sagi Trust, the Trustee will address these issues in the future if the Sagi Trust actually proceeds with a motion to dismiss on personal jurisdiction grounds.
[5] In contrast to Orly Genger, who has unfortunately been adverse to almost all of the trustees of the Orly Genger Trust since 2004, including among others, David Parnes (Sagi's friend and lawyer), Dalia Genger, Michael Oldner, and Leah Fang (Sagi's sister in law), Sagi Genger was able to negotiate with his cousin's husband (Assaf Sternberg) an assignment of his trust's claims to himself several years ago.

9

to Oldner who promptly signed them that same day.  There was no testimony indicating that the Trustee of the Sagi Trust appeared in Texas on his or her own to obtain the Sagi Trust Release.  As such, Sagi Genger, at a minimum, acted as the Sagi Trust's agent in connection with obtaining the Sagi Trust Release for the benefit of the Sagi Trust.[6]  Therefore, the Trustee's service of the Summons and Complaint to the attention of Sagi Genger in his capacity as an agent of the Sagi Trust was proper.

20.    <u>Sixth</u>, having already appeared in the bankruptcy case by virtue of the Sagi Trust Objection, the Trustee's additional service of the Summons and Complaint by express mail and federal express on the Sagi Trust at an address provided to Trustee's counsel by Emmet Marvin was appropriate.  Clearly, by virtue of the Sagi Trust's receipt of the Summons and Complaint in its own offices and notice provided to it from its agents Emmet Marvin and possibly Sagi Genger, there is no doubt that the Sagi Trust has received due process.  The United States Supreme Court has explained that due process is satisfied when the method of service provides "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also Knit With v. Knitting Fever, Inc.*, 2010 WL 4977944 at *4 (E.D. Pa., Dec. 7, 2010) (same); *see also Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (service by registered mail does not violate constitutional due process).  Further, as referenced in the oft-cited case of *United States v. Davis*, 38 F.R.D. 424, 425-26 (N.D.N.Y. 1965):

> There is no fear…that service of the summons and complaint upon [the attorney] would not be brought home to each principal. This is at times a matter of concern in these problems of service of process through claimed authorized agent. That service of process upon their lawyer would bring notice of the lawsuit to [the client] seems beyond argument and is evident here from the motion itself on their behalf to quash the service. Also, a lawyer endowed with all the authority given as here to

---

[6] The record of the Genger family litigation also reveals that Sagi Genger had a prominent role in negotiating the terms of the sale of the Sagi Genger Trust shares to the Trump Group.

act and appear is about the best candidate one could choose to insure notice of a pending suit.

21.      As is clear from the Sagi Trust's ability to file the Motion to Dismiss, they have received adequate notice of this action and most certainly have had an opportunity to present objections, as required by *Mullane*, and through their retention of Emmet Martin, the Sagi Trust is obviously in touch with their counsel, as set forth in *Davis*.

22.      <u>Finally</u>, if the Sagi Trust argues that the filing of the Sagi Trust Objection in the main bankruptcy case simply means it has subjected itself to the jurisdiction of the Court in the main case, but not any other adversary proceedings, the Trustee respectfully requests that the Court reject that argument.  The Complaint in this action seeks damages for violations of the automatic stay, among other things.  Courts have held that violations of the stay can be prosecuted by either adversary complaint or by way of motion in the main bankruptcy case. *See In re Hildreth*, 362 B.R. 523, 526 (Bank. M.D. Ala. 2007) (a motion to recover damages for violation of the automatic stay may be brought by motion) (citing cases); *see also In re LTV Steel Co., Inc*. 264 B.R. 455, 462-63 (Bankr. N.D. Ohio 2001) (same); *see also In re Timbs*, 178 B.R. 989, 994 (Bankr. E.D. Tenn. 1994) (same).   Clearly, had the Trustee proceeded by motion, instead of adversary complaint, there could be no dispute that service by mail of a motion on a party or its attorney that has appeared in the main case would be appropriate. *In re Residential Capital LLC*, 2015 WL 2256683 at *5 (Bankr. S.D.N.Y. May 11, 2015) (finding that service of bar date notice on attorney for creditor, as opposed to creditor itself, was "legally sufficient from a due process standpoint" in light of attorney's representation of creditor in bankruptcy case and separate state court action); *see also In re Worldcom, Inc*., 2005 WL 3875192 (Bankr. S.D.N.Y. Oct. 27, 2005) (same); *see In re Century Elecronics Manufacturing Inc.*, 284 B.R. 11 (Bankr. D. Mass. 2002) (finding that service on attorney that filed appearance and took positions in the bankruptcy case as it relates to client's executory contract rights is deemed to have had implicit authority to accept service of the

11

debtor's notice of assignment of contract); *see e.g. In re Navigator Gas Transport PLC*, 358 B.R. 80 (Bankr. S.D.N.Y. 2006) (finding that party that filed an objection to a plan has submitted itself to the personal jurisdiction of the bankruptcy court).

### B. In the Event That the Court Deems Service to Be Improper, the Trustee Respectfully Requests Additional Relief

23.    To be clear, the Trustee believes the service was properly effected by virtue of the service described herein and in the Declarations of Service.  However, in the event that Sagi Genger and Emmet Marvin dispute that they are agents of the Sagi Trust or they file a future motion on the basis of lack of personal jurisdiction, the Trustee respectfully requests that the Court permit jurisdictional discovery for the purpose of understanding, among other things, the Sagi Trust's role in connection with he Sagi Trust Objection, the procurement of the Releases on its behalf, and its retention arrangement with Emmet Marvin at the time that it filed the Sagi Trust Objection in this court.[7] *See e.g. Picard v. Magnify Inc. (In re Bernard Madoff)*, 2012 Bankr. LEXIS 2748 at *21 (Bankr. S.D.N.Y. June 15, 20212) (jurisdictional discovery is "typically permitted where the facts necessary to establish personal jurisdiction…lie exclusively within the defendant's knowledge); *see also In re Sledziejowski*, 2016 WL 6155929 at *10 (Bankr. S.D.N.Y. Oct. 21, 2016) (citing cases).

24.    In lieu of jurisdictional discovery, to the extent that the Court finds that the prior service of the Summons and Complaint was somehow improper, the Trustee respectfully requests that the Court authorize the Trustee to serve the Complaint on either Emmet Marvin or Sagi by first class mail or email (or other appropriate means) in accordance with Rule 4(h) and Rule 4(f)(3) of the Federal Rules of Civil Procedure.  Courts across the country routinely grant requests under Rule 4(f)(3) to allow service on a defendant's domestic counsel. *See Hawkins v. Bank of American,*

---

[7] The Trustee reserves the right to strike the Sagi Trust Objection to the extent that it was filed without proper authority from the trustee of the Sagi Trust.

*N.A.*, 2018 WL 1616941 at *3 (S.D. Cal. Apr. 4, 2018) (noting that Plaintiff's Rule 4(f)(3) requests for alternative service by email and on [the defendant's] U.S.-based counsel are amply supported by case law); *In re TK Holdings, Inc.*, 2021 WL 954827 (Bankr. D. Del. March 8, 2021) (allowing service of summons and complaint by first class mail and email on U.S. Counsel to foreign defendants); *see In re Int'l Telemedia Assocs., Inc.*, 245 B.R. 713 (Bankr. N.D. Ga. 2000) (authorizing email service under Fed R. Civ. P. 4(f)(3)); *see also In re Heckmann Corp*. SEC. Litig., 2011 WL 5855333 (D. Del. Nov. 22, 2011) (finding it permissible for courts to authorize email service under Rule 4(f)(3) if such service is reasonably calculated to put the individual on notice of proceedings). Courts have done so even where the plaintiffs have not first attempted service under other means, reasoning that a plaintiff need not pursue other methods of service before requesting that the court authorize an alternative method under Rule 4(f)(3). *Brown v. China Integrated Energy, Inc.*, 285 F.R.D. 563, 565 (C.D. Cal. 2012) (authorizing alternative service on U.S. Counsel in spite of the defendants' argument that "plaintiffs have not even tried to serve the Individual Defendants properly  in the People's Republic of China") (quotations and alterations omitted); *I.M. Wilson, Inc. v. Otvetstvennostyou Grichko*, 2018 WL 6446601 (E.D. Pa. Dec. 10, 2018) (permitting service on U.S. Counsel without a showing by the plaintiff that it had attempted service pursuant to the Hague Convention); *see also Vanderhoef v. China Auto Logistics, Inc.*, 2019 WL 6337908 at *4 (D. N.J. Nov. 26, 2019) (Courts have consistently held that service pursuant to Rule 4(f)(3) is proper when effectuated on a foreign individual's U.S. Counsel if there is regular contact between the two, regardless of whether they have been explicitly provided the authority to do so). Indeed, although the Sagi Trust cited an earlier opinion in the *Armed Forces Bank N.A. v. Dragoo*, 2017 WL 11237565 (D. Ari. Sept. 22, 2017) that granted a motion for insufficient service, further research reveals that even the court in that case ultimately

allowed the plaintiff to serve a Cook Islands corporation by email to their U.S. Counsel. *See Armed Forces Bank NA v. Dragoo*, 2018 WL 8621583 (D. Ari. May 23, 2018).

25.     In conclusion, the Trustee respectfully requests that the Court deny the Motion to Dismiss in its entirety.

## **RESERVATION OF RIGHTS**

26.     The Trustee reserves the right to supplement this Objection before the hearing on the Motion and introduce any additional legal arguments and exhibits in support of the Objection.

## **CONCLUSION**

For the foregoing reasons, the Sagi Trust's Motion to Dismiss should be denied in its entirety and this Court should grant such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        December 2, 2021

TARTER KRINSKY & DROGIN LLP

By:  /s/Rocco A. Cavaliere
        Rocco Cavaliere
        1350 Broadway
        New York, New York 10018
        Telephone: (212) 216-8000
        Email: rcavaliere@tarterkrinsky.com

*Counsel to Plaintiff Deborah J. Piazza,*
*as Successor Chapter 7 Trustee of the*
*Bankruptcy Estate of Orly Genger*

**EXHIBIT A**

# THE SAGI GENGER 1993 TRUST

December 30, 2012

Sagi Genger
1211 Park Ave.
New York, NY 10128

Dear Mr. Genger:

This letter will confirm our understanding regarding the assignment of rights to you, as more fully described below, in connection with, arising out of, or resulting from that certain divorce Stipulation of Settlement between Arie Genger and Dalia Genger, signed on or about October 30, 2004 (the "Stipulation of Settlement").

For the avoidance of doubt, the term "Stipulation of Settlement" includes, but is not limited to, all documents and legal instruments entered into in connection therewith, such as a letter agreement dated October 29, 2004 by which TPR Investment Associates, Inc. ("TPR"), a Delaware corporation, sought to sell shares of Trans-Resources, Inc. ("TRI"), a Delaware corporation, to, among others, the Sagi Genger 1993 Trust (the "SG Trust"), as well as a 2008 funding agreement which would have ratified the terms thereof.

The SG Trust hereby assigns, distributes, grants and transfers to you all of its right, title and interest in and to any and all claims, demands, and/or causes of action of any kind whatsoever that the SG Trust has against TRI, its present and past officers and directors, and their respective affiliates, concert-acting or related parties (including, but not limited to, Arie Genger, William Dowd, Orly Genger, and the Orly Genger 1993 Trust), in connection with, arising out of, or resulting from the Stipulation of Settlement.

Solely in connection with the foregoing, you shall assume sole and complete control of any and all litigation and related activities, matters and proceedings, including without limitation, initiating, filing lawsuits, petitions, actions and the like, whether in the United States or elsewhere, and shall have the discretion to decide whether and how to institute and enforce actions against certain or all potential defendants or related parties, and whether and how to settle, compromise, reassign, or otherwise dispose of any such actions, and to give a release in the SG Trust's name in full discharge of the liability thereunder.

[ *remainder of page intentionally left blank - signature page follows* ]

Yours truly,

The Sagi Genger 1993 Trust

_____

Assaf Sternberg, acting as trustee

ACCEPTED AND AGREED:

Sagi Genger

_____

**EXHIBIT B**

Genger v. Genger, 2015 WL 112831 (2015)

2015 WL 112831 (N.Y.Sup.), 2015 N.Y. Slip Op. 30008(U) (Trial Order)
Supreme Court, New York.
New York County

Arie GENGER and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust,
Plaintiffs,
v.
Sagi GENGER, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Rochelle Fang,
individually and as trustee of The Sagi Genger 1993 Trust, Glenclova Investment Company, TR Investors, LLC,
New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch, and Trans-Resources,
Inc., Defendants.
Sagi Genger, individually and as assignee of the Sagi Genger 1993 Trust, and TPR Investment Associates, Inc.,
Cross-Claimants, Counterclaimants, and Third-Party Claimants,
v.
Arie Genger, Orly Genger, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR
Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch, Trans-Resources, Inc., and William Dowd,
Cross-Claim, Counterclaim and/or Third-Party Claim Defendants.

No. 651089/2010.
January 7, 2015.

**Decision and Order**

For cross claimants: John Dellaportas, Esq., Morgan Lewis & Bockius LLP, 101 Park Ave., New York, NY 10178-0060,
212-309-6690.

For cross claim defendants: William P. Frank, Esq., John Boyle, Esq., Skadden, Arps, et al., Four Times Square, New York,
NY 10036, 212-735-3000.

**Motion sequence no. 032**

**BARBARA JAFFE, JSC:**

**\*1** Cross claim defendants Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC,
Jules Trump, Eddie Trump, Mark Hirsh (collectively, the Trump Group) and Trans-Resources, Inc. (TRI) seek an order of
this court pursuant to  CPLR 213,  214,  3016(b), and  3211(a) (1), (3), (5), and (7) dismissing the first, second,
third, sixth, seventh, and tenth cross claims against the Trump Group and TRI in TPR/Sagi's first amended answer,
counterclaims, cross claims, and third-party complaint. (NYSCEF 432). The Trump Group and TRI seek to dismiss all six
cross claims, namely: fraud and aiding and abetting fraud; aiding and abetting a breach of fiduciary duty; breach of a
stockholders agreement; tortious interference with a transfer agreement; tortious interference with prospective economic
relations; as well as contribution and indemnification.

By notice dated August 23, 2014, TPR/Sagi voluntarily dismissed the cross claims against the Trump Group, but not against
TRI. (NYSCEF 1085). For the reasons stated herein, the instant motion to dismiss is granted in its entirety.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                                1

### I. BACKGROUND

The facts of this case have been set forth in great detail in prior decisions of this court, the Delaware courts, the United States District Court for the Southern District of New York (SDNY court), and the Appellate Division, First Department, each of which has fully described the facts relating to the protracted litigation among the Trump Group and the members of the Genger family for control of TRI, a company that makes and sells chemicals for agricultural use. For purposes of the instant motion, only the relevant facts are summarized below.

Arie Genger and Dalia Genger are the father and mother of their son Sagi Genger and daughter Orly Genger. Before 2001, TRI was a wholly-owned subsidiary of TPR, a company owned by the Genger family. Arie owned 51 percent of TPR and the remainder interest was held by a limited partnership composed of Dalia, the Sagi Trust and the Orly Trust,

In 2001, when TRI was almost insolvent, Arie sought aid from the Trump Group of investors, which agreed to invest in, and become a minority stockholder of, TRI with an interest of 47.15 percent. They entered into a stockholders agreement, pursuant to which if any party sought to transfer or sell its TRI shares to anyone other than Arie, that party was required to give written notice to the other TRI shareholders, each of which would have a right of first refusal. It was also agreed that the failure to comply with the transfer restriction would render the transfer void, thereby entitling the non-transferring stockholders to purchase the transferred shares at the fair market value as of the time of the transfer. Based on the Trump Group/TRI's unrebutted assertions, Sagi participated with Arie in the negotiation of the TRI stockholders agreement. (NYSCEF 733, at 5, 6 and 14; NYSCEF 888, at 1, 4, 6 and 7). These unrebutted assertions have significant legal consequences and ramifications, as discussed below.

**\*2** In October 2004, after a contentious divorce proceeding, Arie and Dalia entered into a settlement stipulation that provided for a division of their marital property. It is uncontroverted that Sagi assisted in negotiating that settlement as well (NYSCEF 1085, at 4), pursuant to which Arie and Dalia agreed to instruct TPR to transfer its TRI shares, or 52.85 percent of TRI, to the Genger family members, namely, to Arie himself, who was a permitted transferee under the stockholder agreement, and to the Sagi Trust and the Orly Trust, non-permitted transferees. Arie falsely represented in the settlement agreement that, except for TPR, no consent was required for the transfer of the TRI shares. (*See* 🚩 *TR Invs., LLC v Genger*, 2010 WL 3279385, \*10 [Del Ch Aug. 9, 2010], *affd* 26 A3d 180 [Del 2011]).

On October 26, 2004, Arie resigned from TPR. Soon thereafter, on October 29, 2004, as agreed, Arie transferred his TPR shares to Dalia, TPR transferred its TRI shares to Arie and the Sagi and Orly trusts (collectively, the 2004 transfers), and Sagi became TPR's president and CEO. That same day, Sagi, on behalf of TPR, executed the transfer agreement, thereby effectuating the 2004 transfers. (NYSCEF 741).

In the spring of 2008, TRI again faced financial difficulty and was threatened with foreclosure by a lender. Arie, who was then TRI's chairman, asked the Trump Group for a capital infusion in exchange for additional shares of TRI, such that the Trump Group would gain majority control of TRI. The Trump Group agreed and, at a meeting held in mid-June 2008, provided Arie with a draft funding agreement. As TPR was listed in the draft agreement as a TRI stockholder, and given the 2004 transfer of TPR's shares in TRI, Arie was obliged to disclose to the Trump Group that TPR was no longer a TRI stockholder, having transferred its stock in TRI to Arie and the Sagi and Orly trusts four years earlier pursuant to the divorce settlement. Notwithstanding the violation of the stockholders agreement, the Trump Group and Arie continued to negotiate the draft funding agreement. (TR *Invs.*, 🚩 2010 WL 3279385 at \*9).

In August 2008, upon anticipating that Sagi would resist a transfer of control of TRI to the Trump Group, and as an alternative source of funding had become available, TRI, through Arie, terminated the negotiation of the funding agreement with the Trump Group. As a result, by letter dated August 8, 2008, the Trump Group invoked its contractual right under the 2001 stockholders agreement to purchase all of the TRI shares that were transferred in 2004 in violation thereof. When TRI and Arie disputed the Trump Group's right to purchase the shares, the Trump Group commenced an action in the SDNY court on August 11, 2008. (*Id*. at 10).

**\*3** In enforcing its contractual purchase rights by buying all of the TRI shares, the Trump Group entered into two agreements with TPR/Sagi: (1) a main agreement whereby TPR and the Sagi Trust would sell the Sagi Trust shares, comprising a 19.5 percent equity interest in TRI, to the Trump Group, whether or not the 2004 transfers were judicially determined to be void,

thereby giving the Trump Group majority control of TRI; and (2) a side letter agreement whereby the Trump Group was given the option of buying the TRI shares that were transferred to Arie and the Orly Trust, thereby giving the Trump Group total control of TRI, if and when such shares were combined with the Sagi Trust shares, although that option would be triggered only if the 2004 transfers were judicially determined to be void.

On August 22, 2008, pursuant to the main agreement, TPR/Sagi sold the Sagi Trust shares to the Trump Group for $26.7 million. By letter agreement dated August 28, 2008, TPR/Sagi agreed that the purchase price for the Sagi Trust shares, as well as all of the terms and conditions of the stock purchase agreement, "were and are fair, reasonable and acceptable." (NYSCEF 736). In February 2011, pursuant to the side letter agreement, the Trump Group exercised its option and purchased the Arie shares and the Orly Trust shares in TRI.

The sale and purchase of the invalidly transferred TRI shares, the quest for a judicial determination of the record and beneficial ownership of such shares, and the ensuing fight for control of TRI, have spawned protracted and multifarious litigation in various jurisdictions. The complex history and outcome of that litigation has also been set forth in many judicial opinions. (*See e.g., Genger v Genger*, 121 AD3d 270 [1st Dept 2014]; *Glenclova Inv. Co. v Trans-Resources, Inc.*, 874 F Supp 2d 292 [SD NY 2012]; *Genger v TR Invs., LLC*, 26 A2d 180 [Del 2011]). The instant opinion is addressed solely to whether Arie's misrepresentation about the transferability of the TRI shares in 2004, and Arie/TRI's alleged failure to disclose the funding agreement to TPR/Sagi in 2008, warrant the damages sought by TPR/Sagi against the Trump Group and TRI, as alleged in the cross claims. The Arie and Orly Trust shares in TRI, and the purchase prices paid by the Trump Group for those shares, are not relevant and will not be addressed.

## II. ALLEGATIONS

As summarized by TPR/Sagi in their opposition to the Trump Group/TRI's motion to dismiss those claims (NYSCEF 844), the cross claims consist of two components. First, it is alleged that in 2004, TRI's management misrepresented to TPR/Sagi that TPR's 52.85 percent ownership in TRI could be conveyed to the Sagi Trust without the consent of any shareholder other than TPR, and that the Sagi Trust would receive clear title to the TRI shares. Second, it is alleged that in 2008, TRI's management failed to disclose to TPR/Sagi the draft funding agreement and other opportunities to ratify the 2004 transfers so as to enable the Sagi Trust to retain its TRI shares. Due to the alleged misconduct of TRI and its management, TPR/Sagi contend that the Sagi Trust was unable to retain its TRI shares and was compelled to sell them to the Trump Group "simply to salvage a small fraction of their market value," thereby sustaining enormous monetary damages. (*Id*. at 1-2). TPR/Sagi also assert that, pursuant to the main agreement, they sold the Sagi Trust shares to the Trump Group for $26.7 million, at an 86 percent discount of their 2008 market value of $195 million. (*Id*. at 11-12).

## III. ANALYSIS OF OVERARCHING CONSIDERATIONS

**\*4** Although TPR/Sagi allege that the TRI shares were purchased by the Trump Group at a large discount, they do not dispute that they had agreed that the purchase price, terms and conditions of the 2008 stock purchase agreement were fair, reasonable, and acceptable, and they also acknowledge that, in the post-divorce arbitration, the arbitrator adopted an appraisal for all of the TRI shares and valued the Sagi Trust shares at approximately $10.3 million as of 2004. (NYSCEF 844, at 11). And, according to the Delaware court, "the Trump Group was giving up its right to purchase the shares from TPR at 2004 prices, which likely would have allowed the Trump Group to obtain the Shares for much less than the approximately $26 million it paid to purchase the Sagi Shares" (*TR Invs. v Genger*, 2010 WL 291704, at *17 [Del Ch July 23, 2010]). TPR/Sagi also concede that, under the 2001 stockholders agreement, the Trump Group had the right to purchase the invalidly transferred TRI shares at 2004 values, that the 2004 transfers were judicially voided because they were effectuated in violation of the stockholders agreement (NYSCEF 844, at 2-3), and that pursuant to the 2008 stock purchase agreement, TPR/Sagi "settle[d] with the Trump Group for the maximum that [they] could hope to recover in litigation" (*Id*. at 11).

Given TPR/Sagi's concessions, the judicial findings and documentary evidence, the Trump Group has established that the

*Genger v. Genger, 2015 WL 112831 (2015)*

price it paid for the Sagi Trust's TRI shares was fair, reasonable and acceptable. ( CPLR 3211[a][1]).

However, TPR/Sagi ask that all of this evidence be disregarded, arguing that, even if the price paid by the Trump Group for the Sagi Trust shares was fair and reasonable as between them and the Trump Group, TRI wrongfully encumbered the Sagi Trust shares, and that the price paid for the shares by the Trump Group reflects that encumbrance, thereby entitling TPR/Sagi to be recompensed in their cross claims. (NYSCEF 844, at 3). They analogize the circumstances at issue here with those of a hypothetical homeowner who sells his house to a scrap dealer after it was burned down by an arsonist. Although the scrap dealer purchases the demolished house for a "fair" price, and the property owner sells it for a price that, given the arson, is fair, the arsonist remains liable notwithstanding the scrap dealer's purchase. Similarly, TPR/Sagi claim that the sale of TRI to the Trump Group does not absolve TRI of its original wrong, and as the Trump Group purchased TRI with its assets and liabilities, TPR/Sagi's cross claims constitute some of those liabilities. (*Id.*)

**\*5** TPR/Sagi's voluntary dismissal of the cross claims against the Trump Group, however, remains significant in addressing their case against TRI. As the Delaware court observed, "if violation of the Stockholders Agreement has deepened the Genger Family's internecine feud, that is unfortunate. But it is not the Trump Group's problem, *nor is it a basis for an appeal to this court's sense of equity.*" (TR Invs., 2010 WL 2901704, at \*18) (emphasis supplied). It is equity that poses the obstacle to permitting the cross claims to proceed here against TRI. To permit it is to accomplish indirectly what cannot be accomplished directly, namely, to revisit the bargain that TPR/Sagi knowingly and willingly struck many years ago with the Trump Group. Moreover, because the Trump Group wholly owns TRI now, permitting the cross claims to proceed against TRI would in effect countenance a suit against the Trump Group, notwithstanding TPR/Sagi's voluntary discontinuance of the cross claims against it. In light of the discontinuance, TPR/Sagi's complaint that the Trump Group "obtained a billion-dollar company for pennies on the dollar" (NYSCEF 844, at 2) rings hollow.

Significantly, as it is undisputed by TPR/Sagi that Sagi participated in negotiating the TRI stockholders agreement, the issue is conceded. ( *Kronick v L.P. Thebault Co., Inc.*, 70 AD3d 648, 649 [2d Dept 2010] [plaintiff abandoned her claim by failing to oppose or rebut that branch of defendant's motion which was to dismiss it); *Gary v Flair Beverage Corp.*, 60 AD3d 413, 413 [1st Dept 2009] ["plaintiff's failure to address this issue in its responding brief indicates an intention to abandon this basis of liability"]). Thus, Sagi was aware, or should have been aware, of the transfer restriction on the TRI shares, such that TPR/Sagi should have obtained from Arie the requisite consents or notices before executing the 2004 transfers. Nonetheless, Sagi signed the transfer agreement on TPR's behalf and effectuated the transfers in violation of the stockholders agreement. (NYSCEF 733, at 6). As noted above, Sagi's participation in the events underlying the transfers is asserted in the Trump Group/TRI's pleadings, and was repeated by counsel at the July 2, 2014 oral argument without rebuttal. (NYSCEF 1085, at 4).

Given Sagi's role in the events preceding and underlying the 2004 transfers, TPR/Sagi are more accurately characterized pursuant to their own analogy as members of the team of arsonists who, in concert with Arie and his alleged cohorts, burned down the house (the Sagi Trust shares and other TRI shares), because the Trump Group (the scrap dealer) was not notified of the invalid transfers (the arson) by the Genger family and their family-owned corporations until June 2008, when the funding agreement was being negotiated. Therefore, the alleged encumbrance on the TRI shares did not proximately result from Arie's misrepresentation, but from the Trump Group's valid exercise of its purchase rights under the stockholders agreement, which was breached by TPR, a signatory thereto and a company then controlled by members of the Genger family. Thus, TPR/Sagi's alleged injury was essentially self-inflicted, and the Trump Group's alleged windfall, if any, is immaterial.

**\*6** Additionally, the contention that TPR/Sagi had no reason to question that Arie had obtained the consent of his close friend Jules Trump (NYSCEF 844, at 5) is of no significance, absent an affirmative representation or evidentiary showing by Arie that the consent had in fact been obtained. (*See* 60A NY Jur 2d, Fraud and Deceit § 91 ["Concealment becomes a fraud where there is an act that affirmatively tends to a suppression or disguise of the truth or to a withdrawal or distraction from the real facts."]). Given Sagi's uncontroverted participation in negotiating the TRI stockholders agreement, and thus his knowledge of the shares transfer limitations therein, it was unreasonable for TPR/Sagi to rely on Arie's misrepresentation, without receiving verifiable evidence that the required consents were in fact procured.

TPR/Sagi's claim that they and the Sagi Trust are distinct entities that sustained different damages (NYSCEF 844, at 5) is also not legally significant, as they share common, if not identically aligned interests: Sagi is CEO of TPR and the the beneficiary and purported assignee of the Sagi Trust, and they are all represented by the same counsel pursuing identical

Genger v. Genger, 2015 WL 112831 (2015)

strategies in these lengthy and arduous proceedings. Moreover, in their own submissions, they blur the lines among them and concede that the harms Arie inflicted on Sagi are those inflicted on the Sagi Trust. In describing the June 20, 2008 memorandum written to Arie by TRI's attorney David Lentz, in which he described the so-called "nuclear option" (NYSCEF 844. at 8-9), TPR/Sagi state in their opposition brief that "[t]he memo laid out various ways to take away the Sagi Trust's shares, concluding that TRI should 'keep Sagi in the dark, unable to get to the value of his TRI holdings for any time in the foreseeable future.' " They also maintain that "TRI's management willfully concealed all this from Cross-Claimants out of malice to Sagi... [and] Sagi was to be given 'no information' and left to 'go into a mushroom.' " (*Id*. at 9). Given the concession that Sagi was the target of the nuclear option, which is claimed to have been designed to deprive Sagi of the TRI shares, and as he has no right to those shares except to the extent that he was a beneficiary of the Sagi Trust, TPR/Sagi (the cross-claimants) are estopped from arguing that Sagi's interest in pursuing the cross claims is separate and apart from that of the Sagi Trust.

TPR/Sagi also argue that, had TRI's management consummated the funding agreement in 2008, the negotiation of which was not disclosed to TPR/Sagi, the Trump Group's purchase rights under the 2001 stockholders agreement would have been extinguished, the 2004 transfers would have been ratified, and the Sagi Trust would have been able to retain the Sagi Trust's TRI shares. (NYSCEF 844, at 7). They rely on certain communications exchanged during the summer of 2008, including the June 20, 2008 memorandum, among TRI's management and counsel, namely, Arie, William Dowd, and David Lentz, which they contend evidence a scheme by which TRI proposed various strategies to deprive the Sagi Trust of the TRI shares and to keep Sagi in the dark. (*Id*. at 8).

**\*7** The assertion that the consummation of the funding agreement would have enabled the Sagi Trust to "retain" its TRI shares is relevant to whether the Sagi Trust is entitled to pursue relief under the TRI stockholders agreement and thus, its capacity under CPLR 3211 (a) (3) to be a plaintiff in this action. According to TPR/Sagi, the Delaware court's ruling that the 2004 transfers were void and that the Sagi Trust shares "reverted" to TPR signifies that those shares were once owned by the Sagi Trust, which also means that it was a TRI shareholder from 2004 to 2008. (NYSCEF 844, at 4-5). On the other hand, the Trump Group/TRI contend that, because noncompliant transfers are void, as opposed to voidable, under the stockholders agreement. the Sagi Trust never owned the TRI shares and was never a shareholder.

Assuming that the Sagi Trust was a shareholder and was entitled under section 1.5 of the TRI stockholders agreement to financial statements or other material reports regarding TRI's performance, the draft funding agreement constitutes neither a financial statement nor a report regarding TRI's performance. Assuming also that even if the draft agreement was required to be disclosed or turned over to TPR/Sagi for whatever reason, the claim that the disclosure would have had an impact on the Trump Group's purchase rights is speculative, given its contractual right to void the 2004 transfers. As the Trump Group observes, "in not one single draft of the Funding Agreement is there even a mention of the so-called Sagi Trust Shares or of the Trump Entities' Purchase Rights emanating from TPR's breach of the Stockholders Agreement." (NYSCEF 733, at 16). Thus, the argument that the draft funding agreement would have effected a ratification of the 2004 transfers, including the Sagi Trust shares, is too conjectural to warrant the relief sought by TPR/Sagi.

Moreover, that the funding agreement could have been consummated or finalized is of no legal significance, absent a fully agreed-upon formal agreement. (NYSCEF 734, at 11-13). Indeed, TPR/Sagi concede that "a transfer that failed to comply with those restrictions and the prior notice requirement would *automatically* be deemed invalid and void, and would trigger the non-selling stockholders' right to purchase the invalidly transferred shares." (NYSCEF 432, ¶ 13 [emphasis added]).

Based on the foregoing overarching considerations, absent sufficient factual or legal support for the allegations underlying TPR/Sagi's cross claims, they should be dismissed. To the extent any elaboration is required, the cross claims are discussed in greater detail below.

### A. Cross claims

### 1. Fraud and aiding and abetting fraud

*Genger v. Genger, 2015 WL 112831 (2015)*

---

**\*8** TPR/Sagi allege that TRI and its agents made false representations to them that TPR's ownership of the TRI shares could be conveyed without further consent, that TRI was authorized to issue stock certificates for the new shares, that the Sagi Trust would have clear title to its shares, and that TPR/Sagi reasonably relied on the misrepresentations to their detriment.

Given Trump Group/TRI's unrebutted assertion that Sagi participated in the negotiation of the stockholders agreement and the divorce settlement, and was thus, if not aware of the transfer restrictions on the TRI shares, should have been aware of them, and as he nonetheless signed the transfer agreement on behalf of TPR, thereby effectuating the 2004 transfers in violation of the stockholders agreement of which TPR itself was a party, TPR/Sagi's allegation that they reasonably relied on Arie's misrepresentation is unjustifiable ( *Rotanelli v Madden,* 172 AD2d 815, 816 [2d Dept 1991], *lv denied* 79 NY2d 754 [1992] [plaintiff's claim of reliance on alleged misrepresentation was rejected, as he was a party to contract containing terms that contradicted misrepresentation, and plaintiff was presumed to have read contract]), and Sagi's knowledge may be imputed to TPR and the Sagi Trust. Similarly, just as TPR/Sagi seek to impute Arie's misdeeds to TRI, Arie's misdeeds are equally imputed to TPR, because he was a TPR director and used his authority in passing a board resolution authorizing TPR's transfer of the TRI shares. Thus, TPR/Sagi are precluded from recovery against the Trump Group and TRI. ( *See Buechner v Avery,* 38 AD3d 1, 2 [1st Dept 2007] [bankruptcy trustee could not bring tort claims because bankrupt company's management cooperated with third parties in committing alleged wrongs]).

In addition to claiming a misrepresentation in 2004, TPR/Sagi also allege that TRI and its agents fraudulently concealed or failed to disclose the funding agreement and the opportunity in 2008 to ratify the 2004 transfers, and that as a result, TPR/Sagi were forced to sell the Sagi Trust shares at a fraction of their market value to the Trump Group, thus sustaining injury. Again, even assuming the existence of a requirement that the funding agreement be disclosed, the disclosure would have had no impact on the Trump Group's right to purchase the TRI shares at 2004 prices, including the Sagi Trust shares, because those rights are expressly set forth in the stockholders agreement, and TPR/Sagi repeatedly acknowledge it. And again, it is only conjecture that the consummation of the funding agreement could have resulted in the ratification of the 2004 transfers. ( *See e.g.* *Friedman v Anderson,* 23 AD3d 163, 167 [1st Dept 2005] [court dismissed fraudulent misrepresentation and nondisclosure claims because plaintiff failed to establish that alleged act and omission constituted direct cause of any loss]).

### 2. Aiding and abetting a breach of fiduciary duty

**\*9** According to TPR/Sagi, as alleged in their second cross claim against TRI, Arie and William Dowd owed them a fiduciary duty, they breached that fiduciary duty in connection with the 2004 transfers and the 2008 funding agreement, and TRI aided and abetted them in doing so. (NYSCEF 432, ¶¶ 45-48). Again, allowing cross claims against TRI to proceed is tantamount to allowing TPR/Sagi to resurrect, indirectly, the claims it voluntarily dismissed against the Trump Group, which now wholly-owns TRI as a result of TPR/Sagi's sale of all of TRI shares to the Trump Group in 2008.

In any event, a corporation does not assume the fiduciary duties owed by its directors and officers to its purported shareholders. ( *See* *Gates v Bea Assoc., Inc.,* 1990 WL 180137\*6 [SD NY 1990]; *see also Peacock v Herald Square Loft Corp.,* 61 AD3d 442, 443 [1st Dept 2009]). Yet, TPR/Sagi maintain that TRI aided and abetted breaches of the fiduciary duty that Arie owed them, not just as an officer of TRI, "but on other bases as well" (NYSCEF 844, at 22), namely, Arie's "familial fiduciary relationship" to Sagi. That relationship, however, is irrelevant here, as TRI cannot be held liable for a family dispute, and TPR/Sagi cite no law for that proposition. That Sagi may have a personal claim against Arie, does not translate into a claim against TRI, particularly when it is alleged that Arie has a "personal vendetta" against Sagi, and that "Arie acted in certain respects beyond the scope of his agency" (*Id.* at 22-23). Such a claim has no legal significance here, as a corporation cannot be held liable for acts of its executive that were performed outside the scope of the executive's employment. (*McArthur v J.M. Main Street, Inc.,* 46 AD3d 639 [2d Dept 2007]).

TPR/Sagi also assert that in a "close corporation" like TRI, "Arie owed the Sagi Trust a fiduciary duty as a co-shareholder in TRI." (NYSCEF 844, at 22). Even if Arie and the Sagi Trust were co-shareholders, a fact disputed by the Trump Group as it asserts that the transfers to Arie and the Sagi Trusts in 2004 were void, any fiduciary duty allegedly owed by Arie as a shareholder may not be imputed to TRI, and TPR/Sagi provide no authority to the contrary. In any event, TRI is not close

corporation, absent any evidence that it is a statutorily created entity with specific attributes or any mention of it in its corporate charter, the formation of which is governed by specific provisions of Delaware's corporation laws, 8 Del C. § 342. (NYSCEF 888, at 15).

**\*10** TPR/Sagi also cite no authority for the proposition that Arie, as the Sagi Trust's proxy holder, owes a duty to disclose by virtue of his "superior knowledge of essential facts." (NYSCEF 844, at 22). In the only case cited by TPR/Sagi, the court dismissed the plaintiff's claim, holding that the defendant accountants had no duty to disclose. (*Barrett v Freifeld*, 77 AD3d 600, 602 [2d Dept 2010]). There, the issue was for accountant malpractice, whereas here, it is agreed that the issues arise from an adversarial familial relationship. Even if Arie were required to disclose as proxy holder, it would not have made a difference, as a consummation of the funding agreement and ratification of the 2004 transfers are merely conjectural, since the Trump Group held the rights to purchase all invalidly transferred TRI shares. TPR/Sagi's speculations form too slender a thread upon which to hold TRI liable.

### 3. Breach of stockholders agreement

In this cross claim, TPR/Sagi allege that TPR performed under the stockholders agreement while it "innocently [relied] upon the TRI Group's misrepresentation that no additional approvals were required" for the 2004 transfers, and as a result of TRI's continuing breach of the agreement through 2008, TPR was forced to sell the Sagi Trust shares for a fraction of their market value. (NYSCEF 432, ¶¶ 52-54).

As CEO of TPR, and given the Genger family strife and Sagi's participation in negotiating the stockholders agreement, TPR/Sagi had a duty to ensure that the requisite notices and consents were obtained before executing the 2004 transfers. Thus, from the Trump Group/TRI's perspective, TPR by Sagi breached the stockholders agreement. (*See TR Investors, LLC v Genger*, 2013 WL 603164, at \*1 [Del Ch Feb 18, 2013] ["[t]he transfer of the stock out of TPR violated the terms of the Stockholders Agreement that TPR had signed with the Trump Group"]. And, as Arie was a TPR director when he made the misrepresentation in the divorce settlement, TPR's claim is barred from recovery where it too was at fault. (NYSCEF 733, at 14; *see Buechner v Avery*, 38 AD3d at 444 [corporation's bankruptcy trustee precluded from bringing claim because corporation's management allegedly cooperated with third parties in committing alleged wrongs]).

In any event, TPR/Sagi were not injured by selling the Sagi Trust shares to the Trump Group, because the sale was required by the stockholders agreement under the circumstances of an undisputed violation thereof. Thus, any damage arising from the breach of the stockholders agreement was also a proximate result of TPR/Sagi's own action.

### 4. Tortious interference with the 2004 transfer agreement

**\*11** TPR/Sagi assert that while TPR and the Sagi Trust were parties to the 2004 transfer agreement, TRI and its agents intentionally and unjustifiably caused TPR to fail to perform thereunder, thereby tortiously interfering with the transfer agreement, which resulted in the forced sale of Sagi Trust's TRI shares in 2008 to the Trump Group for a fraction of their market value. (NYSCEF 432, ¶¶ 69-72).

To sustain a viable cause of action for the tortious interference of contract, "the plaintiff must show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages." (*White Plains Coat & Apron Co., Inc. v Cintas Corp.*, 8 NY3d 422, 426 [2007]). Here, the Delaware court held that the 2004 transfers were void because they violated the stockholders agreement. Thus, the transfer agreement effectuating the invalid 2004 transfers was also void or deemed void, and void contracts are legal nullities that can neither be breached nor enforced. (*420 East Assocs. v Kerner*, 81 AD2d 545, 546 [1st Dept 1981]).

Nonetheless, TPR/Sagi argue that even if the 2004 transfers were voided, the 2004 transfer agreement was never before the Delaware court and, thus, the agreement was never voided. (NYSCEF 844, at 25). However, the agreement is not

independent of the transfers, which were voided. Yet, TPR/Sagi maintain, even if the agreement was deemed void and TPR "unwittingly violated" it, it was due to TRI's misconduct because its chairman, Arie, caused the TRI shares to be transferred out of TPR in violation of the stockholders agreement. (*Id*. at 25-26). Again, as the transfer agreement is void and invalid, it cannot support a tortious interference of contract claim. (*Jaffe v Gordon*, 240 AD2d 232 [1st Dept 1997] [failure to establish valid contract precluded claimant from pursuing tortious interference claim]).

### 5. Tortious interference with prospective business relations

But for TRI's misconduct in causing TPR's failure to perform the transfer agreement, TPR/Sagi argue, they would have established economic relations with the Trump Group as TRI co-shareholders. (NYSCEF 432, ¶¶ 75-79).

To sustain a cause of action for tortious interference with a prospective economic advantage claim, a plaintiff must allege: (1) a business relation between itself and a third party; (2) the defendant's interference with that relation; (3) that the defendant acted with the sole purpose of harming the plaintiff or used improper or illegal means that amounted to a crime or independent tort; and (4) that such acts injured plaintiff's relation with the third party. (*Schorr v Guardian Life Ins. Co. of Am.*, 44 AD3d 319, 323 [1st Dept 2007]; *Jacobs v Continuum Health Partners*, 7 AD3d 312, 313 [1st Dept 2004]).

**\*12** TPR/Sagi argue that, but for TRI's wrongful conduct, the 2004 transfers would have been effectuated, and the Trump Group and the Sagi Trust would have remained co-owners of TRI. (NYSCEF 844, at 26). They rely on *Harger v Price* for the proposition that, as a shareholder of a closely-held corporation, the plaintiff shareholder has a prospective business relationship with the acquiring entity, and that the cancellation of the plaintiff's shares before the acquisition, due to the misconduct of the corporation's management, precluded that relationship, thereby forming the basis of a tortious interference claim. ( 204 F Supp 2d 699, 709 [SD NY 2002]).

Regardless of whether TPR/Sagi would have remained co-owners of TRI with the Trump Group, which is a speculative proposition, the Trump Group held the contractual right under the stockholders agreement to purchase all of the TRI shares, including the Sagi Trust shares, due to the violation of that agreement, thereby terminating whatever prospective business relationship TPR/Sagi might have anticipated. In *Harger*, the plaintiff was a minority shareholder who claimed that his former co-shareholders wrongfully "did him out" of his equity interest in their closely-held corporation so as to gain for themselves the benefits of a merger/acquisition with a prospective acquiror by cancelling his shares before the acquisition. ( *Harger*, 204 F Supp 2d at 701-704). Here, it was TPR/Sagi, not TRI, that entered into the 2008 stock purchase agreement with the Trump Group, and it was TPR/Sagi that pocketed the proceeds of the sale of all TRI shares, including those that Arie and the Orly Trust claim belong to them. TPR/Sagi do not and cannot claim that their sale of all TRI shares to the Trump Group "did them out" of the shares, having sold them for a fair and reasonable price. TPR/Sagi's loss, if any, was the economic consequence of the bitter feud among the members of the Genger family, which should not be borne by TRI or the Trump Group, having purchased the shares from TPR/Sagi at an admittedly "fair, reasonable and acceptable" price. Equity neither condones nor permits a party to seek an economic advantage or other equitable relief in these circumstances. (*Amarant v D'Antonio*, 197 AD2d 432, 434 [1st Dept 1993] ["Plaintiff will not be heard to complain that defendants are to be restrained from an asserted violation of one agreement under circumstances in which their resort to its provisions was induced by plaintiff's violation of a subsequent agreement."]).

### 6. Contribution and indemnification

**\*13** TPR/Sagi assert that to the extent they incurred liability on Arie's, Orly's, and/or the Orly Trust's surviving claims, the Trump Group and TRI should indemnify them and/or contribute to same. (NYSCEF 432, ¶ 95). As those "surviving" claims have been dismissed (*Genger v Genger*, 112 AD3d 270 [1st Dept 2014], *reargument and leave to appeal denied*, 2014 NY Slip Op 87342 [U] [1st Dept, Oct. 23, 2014], the indemnification/contribution claim is moot.

Genger v. Genger, 2015 WL 112831 (2015)

_____

### 7. Statute of limitations

In their moving brief, the Trump Group and TRI argue that the sixth and seventh cross claims for, respectively, tortious interference with the transfer agreement and tortious interference with prospective business relations, should be dismissed as time-barred given the three-year statute of limitations. Both claims are alleged to have arisen in 2008, but were not brought until 2013. (NYSCEF 733, at 23 and 25). In their opposition brief, TPR/Sagi do not address or contest the argument, and thus are deemed to have conceded it.

Even if it had been addressed, I would find as follows: The misrepresentation was made by Arie in 2004. Consequently, these cross claim are time-barred, having accrued more than six years before the filing of the cross claim complaint in April 2013, or when it was purportedly discovered in August 2008 when TPR/Sagi sold the Sagi Trust shares to the Trump Group, which is more than two years before April 2013. ( CPLR 213 [8]).

Even if the cross claims relate back to the time when Arie filed his second amended and supplement complaint in September 2010, which is espoused by TPR/Sagi but opposed by the Trump Group and TRI, this claim nonetheless should be dismissed on the merits, for the reasons set forth above. And, pursuant to  CPLR 213(8), the discovery of the fraud is subject to a "reasonably diligence" standard, in that the time to sue accrues from the time "the plaintiff claims discovered or fraud, or could with reasonable diligence have discovered it." Here, it is uncontroverted that Sagi participated in the negotiation of the stockholders agreement and the marital settlement agreement and, as such, could have, using reasonable diligence, discovered the misrepresentation, before the transfer agreement was finalized and executed.

It is also undisputed that the alleged breach of the stockholders agreement occurred in 2004, more than six years before the filing of the cross claim complaint. Thus this cross claim is also time-barred. Even assuming that the claim relates back to the filing of Arie's second amended and supplemental complaint, this claim should be dismissed on the merits, based on the reasons set forth above.

**\*14** Alternatively, TPR/Sagi ask that if their cross claims are dismissed, they should be allowed to replead them pursuant to  CPLR 3211(e). While such a request may be granted under certain circumstances, here, TPR/Sagi's attempt to replead will needlessly prolong this litigation, especially where the Trump Group and its now wholly-owned company, and TRI, is essentially an outside bystander caught up in the contentious family feud.


### III. CONCLUSION

For all of the foregoing reasons, it is hereby

ORDERED, that the relief sought in the instant motion to dismiss is granted in all respects, and all cross claims asserted therein, namely, the first, second, third, sixth, seventh and tenth cross claims, by cross claim plaintiffs TPR Investment Associates Inc. and Sagi Genger, individually and as assignee of the Sagi Genger 1993 Trust, against cross claim defendants Glenclova Investment Co., TR Investors, LLC, New TR Equity I, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsh and Trans-Resources, Inc., are dismissed with prejudice.

Dated: January 7, 2015

New York, New York

ENTER:

<<signature>>

Barbara Jaffe JSC

_____

**Genger v. Genger, 2015 WL 112831 (2015)**

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT C**

FILED: NEW YORK COUNTY CLERK 04/18/2016 10:22 AM
INDEX NO. 651089/2010
NYSCEF DOC. NO. 1420
RECEIVED NYSCEF: 04/18/2016

21-01180-lg   Doc 44   Filed 12/02/21   Entered 12/02/21 17:06:11   Main Document
Pg 30 of 48

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

**BARBARA JAFFE**
*J.S.C.*

PRESENT: _____
                                                    *Justice*

PART __12__

Genger Arie
                        -v-
Sagi Genger

INDEX NO. __651089/10__

MOTION DATE _____

MOTION SEQ. NO. __043__

The following papers, numbered 1 to ____ , were read on this motion to/for _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s)._____

Answering Affidavits — Exhibits _____ | No(s)._____

Replying Affidavits _____ | No(s)._____

Upon the foregoing papers, it is ordered that this motion is

**DECIDED IN ACCORDANCE WITH ACCOMPANYING DECISION / ORDER**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S): _____

Dated: __4/15/16__                                        _____, J.S.C.
                                                          **BARBARA JAFFE**
                                                              *J.S.C.*

1. CHECK ONE: .................................... ☐ CASE DISPOSED          ☑ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ................MOTION IS: ☐ GRANTED  ☐ DENIED  ☐ GRANTED IN PART  ☑ OTHER

3. CHECK IF APPROPRIATE: ........................ ☑ SETTLE ORDER          ☐ SUBMIT ORDER

                                                 ☐ DO NOT POST  ☐ FIDUCIARY APPOINTMENT  ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART 12
----------------------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993 TRUST,

                      Plaintiffs,

            -against-

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC.,
DALIA GENGER, THE SAGI GENGER 1993 TRUST,
ROCHELLE FANG, individually and as trustee of
THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

                      Defendants.
----------------------------------------------------------------------------x
SAGI GENGER, individually and as assignee of THE SAGI
GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

                Cross-Claimants, Counterclaimants,
                and Third-Party Claimants,

            -against-

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH, TRANS-RESOURCES, INC.,
and WILLIAM DOWD,

                Cross-Claim, Counterclaim and/or
                Third-Party Defendants.
----------------------------------------------------------------------------x

Index No. 651089/2010

Motion seq. no. 043

**DECISION AND ORDER**

BARBARA JAFFE, JSC:

     In this motion (NYSCEF 1169), Sagi Genger, individually and as assignee of the Sagi

Trust, and TPR Investment Associates, Inc. (TPR) (together, counterclaimants) seek an order

pursuant to CPLR 3212 for partial summary judgment on their (1) second counterclaim against

Arie Genger and Orly Genger and second third-party claim against William Dowd for breach of

fiduciary duty and aiding and abetting such breach; (2) fifth counterclaim against Arie and Orly

for breach of the 2004 transfer agreement; and (3) eighth counterclaim against Arie and Orly for

indemnification. Arie, Orly, and Dowd oppose and each cross-moves for summary judgment

dismissing all counterclaims and/or third-party claims.

## I.  BACKGROUND

The facts of this case have been detailed in many opinions including the Appellate

Division of the First Department, and the Delaware courts.  The following decisions are the most

relevant to the issues raised in this motion and the cross motions, as they are based on similar

core facts. (*Genger v Genger*, 38 Misc 3d 1213 [A], 2013 NY Slip Op 50091 [U] [Sup Ct, NY

County 2013], *affd as modified* 121 AD3d 270 [1st Dept 2014]; and *Genger v Genger*, 2015 WL

112831 [Sup Ct, NY County 2015], *affd* 135 AD3d 454 [1st Dept 2016]).  The germane facts are

summarized below.

Arie and Dalia Genger are the parents of Sagi and Orly.  Before 2001, Trans Resources

Inc. (TRI) was a wholly-owned subsidiary of TPR, a Genger family-owned company.  Arie

owned 51 percent of TPR, with the remaining 49 percent interest held by a limited partnership,

D&K LP, composed of Dalia, the Sagi Trust and the Orly Trust.  In 2001, when TRI faced

financial difficulties, Arie sought aid from the Trump Group, which agreed to invest in TRI, and

became a minority stockholder with a 47.15 percent interest.  They entered into a stockholders

agreement which provided, in relevant part, that if any party sought to transfer or sell its TRI

shares to anyone other than Arie, that party was required to give written notice to the other, along

2

with a right of first refusal, and that the failure to comply with the transfer restriction would render the transfer void, entitling the non-transferring party to purchase the transferred shares at the fair market value at the time of transfer.

In October 2004, Arie and Dalia settled their divorce by stipulation, with Sagi assisting in negotiating the division of the marital property. Arie and Dalia agreed to instruct TPR to transfer its TRI shares to Arie, as well as to the Sagi Trust and Orly Trust (the trusts). Arie misrepresented in the stipulation that, except for TPR, no consent was required for the transfer of the TRI shares. On October 26, 2004, Arie resigned from TPR, and on October 29, 2004, as agreed, Arie transferred his TPR shares to Dalia, TPR transferred its TRI shares to Arie and to the trusts (collectively, the 2004 transfers), and Sagi became TPR's president and CEO. Sagi, on TPR's behalf, signed the transfer agreement to effectuate the 2004 transfers.

In early 2008, TRI again faced financial distress. Arie, then TRI's chairperson, asked the Trump Group to invest capital in exchange for additional TRI shares, such that the Trump Group would gain majority control. The Trump Group agreed and, at a meeting held in mid-June 2008, provided Arie with a draft funding agreement. As TPR was listed in the draft agreement as a TRI stockholder, but given the 2004 transfer of TPR's shares in TRI, Arie was obliged to disclose to the Trump Group that TPR was no longer a TRI stockholder, having transferred its TRI stock to Arie and the trusts pursuant to the divorce settlement. Despite the violation of the stockholders agreement, the Trump Group and Arie continued to negotiate the draft funding agreement.

In August 2008, in anticipation that Sagi would resist a transfer of control over TRI to the Trump Group, and as an alternative source of funds became available, TRI, through Arie, terminated the negotiation of the funding agreement. As a result, on August 8, 2008, the Trump

3

Group invoked its contractual right under the TRI stockholders agreement to purchase all of the

TRI shares that had been transferred in 2004. When TRI/Arie disputed the Trump Group's

rights, the latter commenced an action on August 11, 2008 in a New York federal court seeking a

judicial declaration that the 2004 transfers were void under the TRI stockholders agreement.

Soon thereafter, the Trump Group entered into two agreements with TPR/Sagi to buy all

TRI shares: (1) a main agreement whereby TPR and the Sagi Trust would sell the Sagi Trust TRI

shares to the Trump Group, whether or not the 2004 transfers were judicially determined to be

void, thus giving the Trump Group majority control of TRI; and (2) a side agreement whereby

the Trump Group was given the option to buy the Arie and the Orly Trust's TRI shares, thus

giving the Trump Group total control of TRI, when such shares were added to the Sagi Trust

shares, but that option would be triggered only if the 2004 transfers were judicially determined to

be void.

On August 22, 2008, pursuant to the main agreement, the Sagi Trust shares were sold to

the Trump Group for $26.7 million. When the Trump Group, as majority shareholder, decided to

remove Arie as TRI's director, Arie refused to recognize its authority. Therefore, the Trump

Group commenced an action in the Delaware Chancery Court, pursuant to section 225 of the

Delaware Code, for a judicial determination of TRI's corporate governance.

The Delaware court ruled that, contrary to Arie's assertion, the Trump Group never

ratified the 2004 transfers, and had acquired the Sagi Trust's shares, thereby obtaining majority

voting control of TRI and its governance. It also invalidated the 2004 transfers of TRI's shares to

Arie and the Orly Trust and held that the stock had reverted to TPR and that the Trump Group

could exercise its option to buy such shares pursuant to the 2008 side agreement with TPR. On

4

appeal, the Delaware Supreme Court, in 2011, affirmed that TPR was the record holder of Arie's

and the Orly Trust's TRI shares, but held that the Delaware Chancery Court lacked the

jurisdictional authority to determine who beneficially owned those shares. (*Genger v TR Invs.,

LLC*, 26 A3d 180 [Del 2011]).  In or about February 2011, pursuant to the 2008 side agreement,

the Trump Group exercised its option and purchased the Arie and the Orly Trust's TRI shares.

In 2010, before the Delaware Supreme Court rendered its decision, Arie and Orly

commenced suit in this court, seeking, among other things, a judicial determination that Arie and

the Orly Trust held beneficial interests in the disputed shares.  In a decision rendered in January

2013, I dismissed most of their claims, except for a claim against Sagi for the breach of fiduciary

duty claim and the unjust enrichment claims against Sagi and TPR. (*Genger,* 38 Misc 3d 1213

[A]).  I also declined to dismiss certain claims against the Trump Group; those claims were

subsequently settled in June 2013 by the relevant parties, including Arie, Orly, and the Trump

Group, having reached a comprehensive settlement agreement which, among other things,

recognized that the Trump Group had become the record and beneficial owner of the Arie and the

Orly Trust's TRI shares, in exchange for Trump Group's settlement payments to Arie and Orly.

In a decision issued in July 2014, the Appellate Division affirmed and modified only

those adverse rulings with respect to Sagi and TPR. (*Genger*, 121 AD3d 270).  As a result,

counterclaimants now seek a judicial determination of their counterclaims and/or third-party

claims against Arie, Orly, and Michael Dowd, TRI's chief executive officer.

Counterclaimants also asserted cross claims against the Trump Group and TRI.  In a

decision issued in January 2015, I granted the Trump Group/TRI's motion to dismiss the cross

claims (*Genger*, 2015 WL 112831), which the Appellate Division affirmed (*Genger*, 135 AD3d

5

454 [1st Dept 2014]).

## II.  ANALYSIS

"'The proponent of a summary judgment motion must make a *prima facie* showing of

entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the

absence of any material issues of fact.'" (*Ayotte v Gervasio*, 81 NY2d 1062, 1062 [1993]

[citation omitted]; *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851 [1985]).  If the

proponent's *prima facie* burden is satisfied, the opposing party bears the burden of presenting

evidentiary facts sufficient to raise triable issues of fact. (*Zuckerman v City of New York*, 49

NY2d 557, 562 [1980]; *CitiFinancial Co. [DE] v McKinney*, 27 AD3d 224, 226 [1st Dept 2006]).

Thus, summary judgment may be granted only when it is clear that no triable issues of

fact exist (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]), or "where there is any doubt as

to the existence of a triable issue" of fact (*Am. Home Assur. Co. v Amerford Intl. Corp.*, 200

AD2d 472, 473 [1st Dept 1994]), and the court must examine the evidence in a light most

favorable to the party opposing the motion (*Martin v Briggs*, 235 AD2d 192, 196 [1st Dept

1997]).  This scrutiny is warranted because the entry of summary judgment "deprives the litigant

of his day in court." (*Andre v Pomeroy,* 35 NY2d 361, 364 [1974]).  Bare allegations or

conclusory assertions are not sufficient to create genuine issues of fact necessary to defeat a

summary judgment motion. (*Rotuba Extruders, Inc., v Ceppos*, 46 NY2d 223, 231 [1978]).

Most, if not all, of the counterclaims and/or third-party claims are based on two main

allegations:  that counterclaimants suffered damages because in 2004, Arie misrepresented that

no further consents were necessary for TPR to effectuate the 2004 transfers, and that in 2008,

Arie in concert with Dowd and others, failed to disclose the negotiation of the funding

6

agreement, and that if disclosed, the Trump Group would have ratified the 2004 transfers and entered into the funding agreement with TRI, which would have averted the financial loss suffered by counterclaimants' "forced sale" to the Trump Group of the Sagi Trust TRI shares at a price that was far below the market price.

### A.  Counterclaimants' motion

### 1.  Breach of fiduciary duty (second counterclaim and second third-party claim)

### a.  Claims against Arie

Counterclaimants allege that Arie, as TRI's chairman, owed a fiduciary duty to the Sagi Trust and TPR, as TRI's shareholders, until at least August 2008, and that Arie's 2004 misrepresentation that there were no transfer restrictions caused them injury.  They also argue that because Arie, on behalf of TRI, reneged on the funding agreement with the Trump Group in 2008, TPR/Sagi was forced to sell the Sagi Trust's TRI shares to the Trump Group at a small fraction of its market value, thus sustaining financial injury.

It cannot be disputed that, as a matter of law, Arie did not owe Sagi a fiduciary duty based on their familial relationship, given their estrangement since at least 2007, a circumstance noted by the Appellate Division in holding that no fiduciary duty existed once the parties became adversaries.

Moreover, in my 2015 decision, I provided a detailed analysis of the cross claims filed against the Trump Group/TRI and of the role played by TPR/Sagi in connection therewith. Those cross claims are based on the same core facts underlying the counterclaims advanced here, including Arie's alleged breach of fiduciary duty.  Thus, my findings bind counterclaimants, as they had a full and fair opportunity to litigate the issues in this action. (*Robinson v 1528 White*

7

*Plains Rd. Realty, Inc.*, __ AD3d __, 2016 NY Slip Op 01441 [1ˢᵗ Dept 2016] [issues raised were fully litigated and decided in prior proceeding and plaintiff had full and fair opportunity to litigate them, and to extent not already decided, plaintiff's claims barred as they arose out of same transactions as those in prior proceeding]).

Those findings include, and the Delaware decision does not contradict, that the funding agreement was never executed and had no legal significance, that TPR/Sagi conceded that a transfer in violation of restrictions in the stockholders agreement would automatically be deemed void, that Sagi's claim that a disclosure of the negotiation of the funding agreement would have had an impact on the Trump Group's purchase right is speculative, given its contractual right to void the 2004 transfers, and that the assertion that the draft funding agreement could have effected a ratification of the 2004 transfers was conjectural. (*Genger*, 2015 WL 112831 at * 7). As the 2015 decision was affirmed on appeal, counterclaimants remain estopped from re-litigating these issues. (*Raghavendra v Brill*, 128 AD3d 414 [1ˢᵗ Dept 2015] [claims barred as federal court had made decision as to merit of claims and decision was affirmed on appeal]).

Additionally, the Appellate Division upheld my denial of TPR/Sagi's request to replead "in light of the flaws at the heart of appellant's claims, and its failure to submit any arguments indicating that it would be able to state any viable causes of action upon repleading." (*Genger*, 135 AD3d at 455). Moreover, counterclaimants' attempt to characterize my observation that "Sagi may have a personal claim against Arie" (*Genger*, 2015 WL 112831 at *9) as a finding that Arie had breached a fiduciary duty owed to Sagi is misplaced.

The ground for my 2015 decision is the, *inter alia*, undisputed or unrebutted factual assertion by the Trump Group/TRI that Sagi assisted in the negotiation of the 2001 TRI

8

stockholder agreement and the 2004 marital divorce settlement. (*Genger*, 2015 WL 112831 at *1,

2, 5, 8 and 10). Such participation by Sagi constitutes a defense to the counterclaim against Arie.

Inasmuch as the claims arose in connection with the transfer restriction in the TRI stockholders

agreement, and because Sagi knew or should have known of the restriction when he, on behalf of

TPR, executed documents effectuating the 2004 transfers, such knowledge is imputed to the Sagi

Trust and TPR. (*Id.* at 8).

Counterclaimants nonetheless argue, despite the Appellate Division's affirmance of my

decision, that the "previously unrebutted, and false, allegation about Sagi supposedly negotiating

the TRI Stockholders Agreement has now been debunked," and "[they] did not believe [they]

needed to rebut [it] at oral argument because counsel are not fact witnesses." (NYSCEF 1366 at

3). They rely on Sagi's affidavit, dated January 22, 2015, filed after the issuance of my January

7, 2015 decision and apparently in connection with their appeal, in which Sagi asserts, for the

first time, that he "attended an initial meeting with the Trumps" regarding the "economics" of the

stockholders agreement, but never discussed issues "concerning the restrictions therein on share

transfer." (NYSCEF 1388, exhibit AA).

Counterclaimants' contention that the assertions of Sagi's participation were advanced

only at oral argument is erroneous given my affirmed decision. In any event, per my decision,

the assertions were repeatedly advanced in the Trump Group/TRI's pleadings and were repeated

by counsel at oral argument, without rebuttal. (*Genger*, 2015 WL 112831 at *1 and 5; NYSCEF

733 at 5, 6 and 14; NYSCEF 888 at 1, 4, 6 and 7). Counterclaimants also do not dispute that

Sagi and his counsel, David Parnes, were provided with a copy of the stockholders agreement in

connection with the negotiation of the divorce settlement and the 2004 transfers.

9

Even if Sagi's belated and self-serving affidavit was considered, it cannot be disputed that, as a matter of law, Arie did not owe Sagi a fiduciary duty based on their familial relationship, given their estrangement since at least 2007, a circumstance noted by the Appellate Division in holding that no fiduciary duty existed once the parties became adversaries. (*Genger*, 121 AD3d at 278). Because counterclaimants knew or should have known of the transfer restrictions in the stockholders agreement when the 2004 transfers were made, Arie's alleged breach of fiduciary duty, as it related to the 2004 misrepresentation, could not be reasonably relied on, nor could it be the proximate cause of the damages, if any, allegedly sustained.

Counterclaimants also argue that (1) because the Delaware court found that "Arie could have cured his prior misconduct by implementing the Funding Agreement," but instead caused TRI to renege on the deal "thereby instigating the Trump Group" to force the Sagi Trust to sell its TRI shares at a great loss, and (2) because the June 2008 memo written by attorney David Lentz to Arie and Dowd, which, according to counterclaimants, "describe[d] various ways for Arie to exploit for his own wrongdoing to steal the Sagi Trust's shares" in order for Arie to "harm his son, a beneficial shareholder in TRI, for which Arie served as Executive Chairman," that "Arie is liable for the direct consequences of this clear-cut fiduciary breach." (NYSCEF 1207 at 14-16).

The Delaware proceedings were primarily addressed to a dispute over TRI's governance, which was raised by the Trump Group when Arie refused to recognize its authority. Undisputedly, Sagi did not participate in the proceedings, and the Delaware decision neither focused on nor discussed Sagi's role in the 2004 transfers and 2008 funding agreement. Thus, the Delaware excerpts are inapposite.

In contrast, in my 2015 decision, I provided a detailed analysis of the cross claims filed

10

against the Trump Group/TRI and of the role played by TPR/Sagi in connection therewith.
Those cross claims are based on the same core facts underlying the counterclaims advanced here,
including Arie's alleged breach of fiduciary duty. Thus, my findings bind counterclaimants, as
they had a full and fair opportunity to litigate the issues in this action. (*Robinson*, __ AD3d __,
2016 NY Slip Op 01441 [issues raised were fully litigated and decided in prior proceeding and
plaintiff had full and fair opportunity to litigate them, and to extent not already decided,
plaintiff's claims barred as they arose from same transactions as those in prior proceeding]).

Those findings include, and the Delaware decision does not contradict, that the funding
agreement was never executed and had no legal significance, that TPR/Sagi conceded that a
transfer in violation of restrictions in the stockholders agreement would automatically be deemed
void, that Sagi's claim that a disclosure of the negotiation of the funding agreement would have
had an impact on the Trump Group's purchase right is speculative, given its contractual right to
void the 2004 transfers, and that the assertion that the draft funding agreement could have
effected a ratification of the 2004 transfers was conjectural. (*Genger*, 2015 WL 112831 at * 7).
As the 2015 decision was affirmed on appeal, counterclaimants remain estopped from re-
litigating these issues. (*Raghavendra v Brill*, 128 AD3d 414 [1st Dept 2015] [claims barred as
federal court had made decision as to merit of claims and decision was affirmed on appeal]).

### b. Against Orly

Orly did not breach any fiduciary duty owed by her to counterclaimants, as the
facts and legal theories for the claims against her are substantially the same, if not virtually
identical, to those advanced against Arie. And, because Arie is not liable, Orly cannot be liable
for aiding and abetting him. (*Cambridge Cap. Real Estate Investments, LLC v Archstone Enter.*

11

LP, __ AD3d __, 2016 WL 1098149, 2016 NY Slip Op 02017 [1st Dept] [as claim for breach of

fiduciary duty dismissed, claim for aiding and abetting breach must also be dismissed]).

Counterclaimants maintain that because "Arie has always acted for Orly in all things

relating to TRI," that "Orly has admitted she stood to benefit if her father prevailed," and that

"because Arie caused TRI to renege on the Funding Agreement," Orly is "liable for the damage

Arie wrought as her representative." (NYSCEF 1207 at 19-20). According to the allegations, the

claim against Orly is based on Arie's having reneged on the funding agreement, which allegedly

destroyed the value of the Sagi Trust's shares. On the other hand, even though the Orly Trust is a

named co-defendant, there is no allegation that it breached its fiduciary duty or aided/abetted a

breach.

"An agency relationship may be established by conduct," which is apparent authority, "or

by written or oral contract," which is express authority. (*Pyramid Champlain Co. v R.P.

Brosseau & Co.*, 267 AD2d 539, 544 [3d Dept 1999]). A third party may rely on the apparent

authority of another only when the "words and conduct of the principal, communicated to the

third party, have caused the third party to believe that an agent has the authority to contract on the

principal's behalf." (*Legal Aid Soc. of Northeastern N.Y., Inc. v Economic Opportunity Commn.

of Nassau County*, 132 AD2d 113, 115 [3d Dept 1987]). An agent is subject to the principal's

control. (*Maurillo v Park Slope U-Haul*, 194 AD2d 142, 146 [2d Dept 1993]).

Here, counterclaimants fail to identify any written or oral contract that authorized Arie to

act on Orly's behalf as to the funding agreement. Nor does it identify any word or conduct

communicated to Sagi by Orly that would have lead him to believe that Arie was authorized to

act on her behalf as to the funding agreement, nor do they tender any credible evidence to support

12

their allegation that Arie was Orly's agent. Thus, the allegation of agency fails.

Counterclaimants nonetheless argue that this court and the Delaware court have found that "Arie has always acted as Orly's agent with respect to the TRI shares," relying on inapposite statement fragments. In any event, they must show that Orly appointed Arie as her agent for purpose of the funding agreement, and not generally "with respect to the TRI shares." (*Ford v Unity Hosp.*, 32 NY2d 464, 472 [1973] [agency for one purpose does not invest agent with unlimited authority to bind principal]). (NYSCEF 1366 at 21). Additionally, their reliance on a narrow court statement and their transformation of it into a proposition of law that Orly's adoption of Arie's arguments in her pleadings creates an agency relationship, is misplaced and ill-conceived. (NYSCEF 1366 at 21-22). The adoption of a legal argument for litigation purposes does not an agency create, and counterclaimants cite no authority for it.

Moreover, my statement that Arie testified that "he represented all Genger interests with respect to the TRI shares" may not be isolated from its context and its connection with the Orly Trust and the Sagi Trust voting proxies which Arie acquired pursuant to the 2004 transfers, and that his testimony only showed that he could vote the family-owned TRI shares, but "does not establish that he is Orly's agent in connection with the instant claims." (NYSCEF 1386 at 7; citing Apr. 3, 2015 decision at 10, index no. 109749/2009, NYSCEF 878). Counterclaimants' reliance on the Delaware court's decision, in which it was recognized that Arie "adequately represented" Orly's interests for purposes of determining ownership of the TRI shares, and transformation of it into a proposition that renders Orly liable for Arie's "misconduct in the scope of his agency" (NYSCEF 1366 at 22), is also misguided, as that court "narrowly held" that "the Orly Trust's and TPR's interests in the board election were adequately represented by Genger

13

and the Trump Group," and "repeatedly rejected the contention that Arie could represent or bind

the Orly Trust in any other way." (NYSCEF 1386 at 7-8; citing Delaware court's decision that

Arie could not consent to the court's jurisdiction on behalf the Orly Trust and that only an

authorized representative was legally empowered to do so). Thus, counterclaimants' reliance on

and citation to those decisions is misplaced and erroneous.

### c. Against Dowd

For the reasons stated above, and with respect to the funding agreement in particular, and

for reasons on which I relied in finding that Arie did not breach his fiduciary duty to

counterclaimants, Dowd also did not breach his fiduciary duty, as the facts and legal theories for

the claims against Arie and Dowd are substantially the same, if not identical. Because Arie is not

liable, Dowd cannot be liable for aiding and abetting him. (*Cambridge Cap. Real Estate*

*Investments, LLC v Archstone Enter. LP*, __ AD3d __, 2016 WL 1098149, 2016 NY Slip Op

02017 [as claim for breach of fiduciary duty dismissed, claim for aiding and abetting breach must

also be dismissed]).

### 2.  Breach of transfer agreement (fifth counterclaim)

In my January 2015 decision, I observed that "the Delaware court held that the 2004

transfers were void because they violated the stockholders agreement" [and that [t]hus, the

transfer agreement effectuating the invalid 2004 transfers was also void or deemed void, and void

contracts are legal nullities that can neither be breached nor enforced." (*Genger*, 2015 WL

112831 at *11, 2015 NY Slip Op 30008[U]). As the decision was affirmed on appeal, it

constitutes the law of the case.

Moreover, even though Orly is a named defendant with respect to this claim, she was not

14

a party to the transfer agreement, and counterclaimants failed to plead any facts alleging or

identifying a breach by her.  Rather, counterclaimants' briefs and other pleadings do not mention

or address Orly with respect to this claim.

### 3.  Indemnification (eighth counterclaim)

In plaintiffs' third amended and supplemental complaint, it is alleged that "Sagi owed a

duty of trust and confidence to Arie under the 2004 Voting Trust Agreement" and that as

"successor to the rights and liabilities of Dalia under the [Divorce] Settlement and the manager

of TPR," Sagi owed a fiduciary duty to protect the assets of the Orly Trust for the benefit of his

sister Orly and his father . . ." (NYSCEF 1190, ¶ 209).  Counterclaimants thus argue that Sagi, as

Dalia's successor, is entitled to be indemnified by Arie, pursuant to the terms of article V, section

3 of the divorce settlement, for all professional fees and expenses arising out of the events that

occurred prior thereto. (NYSCEF 1207 at 12-13).

Counterclaimants' attempt to transform an allegation in a complaint into a judicial

admission by Arie fails given the additional allegation that "Sagi owed a duty of trust and

confidence to Arie."  When analyzed in the context of the entire divorce settlement, the

surrounding facts and circumstances, as well as the applicable law, the allegation does not

constitute a judicial admission, particularly as it is undisputed that Sagi was not a party to the

divorce settlement, and article V, section 3 therein specifically provides that "the Husband shall

indemnify, defend, and hold harmless the Wife."

Contractual indemnity clauses "must be strictly construed to avoid reading into it a duty

which the parties did not intend to be assumed" and no promise should be found "unless it can be

clearly implied from the language and purpose of the entire agreement and the surrounding facts

15

and circumstances." (*Rodrigues v N&S Bldg. Contrs.,* 5 NY3d 427, 433 [2005][citation

omitted]).  Moreover, TPR/Sagi did not dispute the holding in another Genger-related action that

"Sagi's successor rights were limited to Dalia's rights and responsibilities as they relate to TPR."

(NYSCEF 1355 at 30, NYSCEF 1387 at 26; citing to that decision, index no. 104249/07 at

12-13, dated Oct. 10, 2013).  Therefore, as a non-party to the divorce settlement, the terms of

which must be narrowly construed for the intended parties only, Sagi is not entitled to invoke the

indemnity provision therein, as a matter of law.

Also, although Orly is named as a defendant with respect to this claim, counterclaimants

fail to allege any facts against her.

<u>B.  Defendants' cross motions</u>

In the cross motions, plaintiffs/counterclaim defendants Orly and the Orly Trust and

third-party defendant Dowd seek summary judgment dismissing all counterclaims and/or third

party claims, including the following: fraud and aiding and abetting fraud, tortious interference

with the stockholders agreement, tortious interference with the transfer agreement, tortious

interference with prospective economic relations, breach of fiduciary duty based on familial

relationship, as well as common-law contribution and indemnification.

<u>1.  Fraud and aiding and abetting fraud (first counterclaim and first third-party claim)</u>

As my dismissal of counterclaimant's claims for fraud and aiding and abetting fraud

against TRI (*Genger*, 2015 WL 112831 at *8-9), was affirmed by the Appellate Division (135

AD3d at 454), and as the claims against Arie, Orly and/or the Orly Trust, and Dowd are identical

to those that were alleged against TRI, they are meritless for the same reasons.

<u>2.  Tortious interference with stockholders agreement claim</u>

16

In the 2015 decision, I dismissed counterclaimants' cross claim for a breach of the stockholders agreement against TRI for the reasons stated therein. (*Genger*, 2015 WL 112831 at *10, *affd* 135 AD3d at 455).   Accordingly, this counterclaim and third-party claim for tortious interference of the stockholders agreement has no merit as a matter of law because it has already been judicially determined that TRI did not breach the stockholders agreement.

### 3.  Tortious interference with transfer agreement

The Appellate Division affirmed my decision that "[t]he 2004 [transfer] agreement cannot be the basis for a tortious interference with contract claim." (135 AD3d at 455).  This claim thus has no merit.

### 4.  Tortious interference with prospective economic relations

In the 2015 decision, I dismissed counterclaimants' cross claim for tortious interference with prospective economic relations as against TRI. (*Genger*, 2015 WL 112831 at *11-12).  On appeal, the Appellate Division affirmed, stating that the claim was "inadequately pleaded and based on conjecture." (*Genger*, 135 AD3d at 455).  Therefore, this claim is also meritless.

### 5.  Breach of fiduciary duty based on familial relationship

Arie's and Orly's cause of action for a breach of fiduciary duty based on the familial relationship against Sagi was dismissed by the Appellate Division. (*Genger*, 121 AD3d at 278). As counterclaimants allege that as Arie and Orly alleged in their complaint that Sagi owed them a fiduciary duty based on their "familial relationship," and that "in the event such a duty is held to exist, then such duty necessarily is mutual," and thus Arie and Orly owed Sagi "a comparable duty" (NYSCEF 1178, ¶ 88), and as all of Arie's and Orly's claims in the complaint were dismissed by the Appellate Division, so too must the cross claims against Arie and Orly arising

17

from the 2004 transfers and 2008 funding agreement, as discussed above.

<u>6.  Common law indemnification and contribution</u>

The tenth counterclaim is dismissed as moot. (NYSCEF at 19).

IV.  CONCLUSION

For all of the foregoing reasons, it is hereby

ORDERED, that the motion of Sagi Genger, individually and as assignee of the Sagi Trust, and TPR Investment Associates, Inc. for an order seeking partial summary judgment is denied in its entirety; it is further

ORDERED, that the relief sought in cross motions by the counterclaim defendants and third-party defendants Arie Genger, Orly Genger, and William Dowd seeking summary judgment dismissing all counterclaims and third-party claims against them, as applicable, is granted in all respects, and the counterclaims and third-party claims against Arie Genger, Orly Genger, and William Dowd are dismissed with costs and disbursements to these defendants as taxed by the Clerk upon the submission of an appropriate bill of costs; and it is further

ORDERED, that the parties are directed to settle order on notice within 30 days of the date of this decision.

ENTER:

_____
Barbara Jaffe, JSC

Dated:      April 15, 2016
            New York, New York

18